Our next case, Sherri Ann Gruber v. PPLRetirement Plan. My name is David Bennett-Rogues, I'm here for the appellant, Sherri Ann Gruber. And I'd love to reserve three minutes for a follow-up, if I may. Yes, sir. A Qualified Domestic Relations Order, or QDRO, is kind of unique in American law, because usually federal pension law is concerned with federal law, not with the vagaries of the state laws. But Congress decided to allow domestic relations... Excuse me, there's some kind of feedback. Is it someone in the hall? Wait a minute. Can you hear that? No, I think it's the volume of the next room. Oh, this room. Okay. It's somehow coming through. No problem. All right. That's fine. Congress has decided to allow a domestic relations order to transfer part of a pension as against the mutual policy that pensions can be alienated or transferred. But if the participant is divorced and there's an order that needs certain qualifications, a portion of the participant's accrued benefit at the time of the divorce can be transferred. I think we're well aware of that, and we're really specifically looking at the stipulation for the entry of the QUADRO in this case, specifically page 58 of the joint appendix, which contains the language here. It talks about her getting 53% of the value of any employer subsidy for early retirement. Now, earlier in the pristine paragraph, there is a language that might have helped your client, actually, talking about accrued benefit, for following a participant's separation from service, which is really what we have here. You're arguing that, in essence, a severance pay because he's terminated should be considered a subsidy for early retirement. But if they knew how to say it in the preceding paragraph about if you separate from service, why should we not construe and agree with Judge Goldberg, who construed a subsidy for early retirement as being just that, for early retirement, but not for a situation where someone is terminated. Retirement doesn't mean you're terminated. When they say forced retirement, someone's been terminated. Wouldn't it be a strange construction that says a subsidy for early retirement applies if someone is terminated for a reduction in force? Well, Your Honor, it's important to keep in mind that the particular benefit we're talking about here was not a regular separation benefit. Employee separation benefits are not pension benefits under ERISA. They're governed by ERISA, but they're governed by the section that applies to health and welfare benefits, ordinarily. If they're simply a benefit that is paid by the employer, condition on nothing other than separation from service and whatever other conditions in that. Just as a digression, did Ms. Rupert, does she get health coverage? I don't know the answer to that, but I don't believe so. Okay, because that was one of the things that's covered under separation is health and other insurance benefits. So basically, you're talking about dollars and cents, right? Well, I am. An employer is free to make a severance benefit plan that would be governed by ERISA, and then employers have severance benefits that they don't do a formal plan, but the courts have held that they are subject to the ERISA health and welfare provisions, not the ERISA pension provisions. What's your point? What's your point? I'm not understanding your point. It's the benefit under the plan, and it is measured by years of service. Benefit under the plan. Under the pension plan. It's under GP 401. It's an enhancement to the pension benefit. In other words, formally on a pension, you wait until you're age 65, and then you get your accrued benefit in the form of a monthly benefit. This doesn't say 53% of the value of any pension benefit. It says 53% of the value of any employer subsidy for early retirement. What's your argument as to why? The employer subsidy for early retirement means the difference in the value of the pension that you get because you retire early and the value of the pension you would have gotten if you had waited until age 65. But you're asking like he retired early. Well, he did. He was forced to retire. He was forced to retire early. Nevertheless, the pension plan is involuntary or involuntary. It doesn't matter for purposes of whether it's a pension benefit. He got a pension benefit from the pension plan, and instead of getting 80% of the pension benefit, he got 100% of the pension benefit based on his 32 years of service. And that he was management and things like that. Well, there was a formula in the pension plan for when you get age 65, and the benefit we're talking about right now says even if you're before age 65, or no, you have to wait until you're 65 and then you get that pension benefit. Well, you take that pension benefit paid by the pension plan, in this case, eight years early. Let me just go back to the whole point. You keep talking about the plan. If you're talking about the plan, then you give a lot more discretion to the plan administrator than if you're talking about the QDRO, which is de novo review. Judge Goldberg said this is de novo review because the principle that we're doing is we're interpreting the QDRO. Why do you keep talking about the plan? Well, I'm trying to emphasize in response to Judge Randall's question that... No, before she asked the question, you're talking about the plan. Okay, the plan is a party, and the plan is the one that pays the benefits. But the interpretation at issue is the meaning of the QDRO, and it is de novo review. I believe that it should be interpreted in light of the intent of the statute that it drew its terms from. The statute was merely intended... But we'll look at the language, and that's what Judge Goldberg alluded to. Is it ambiguous? Well, I don't think it's ambiguous. I think that Judge Goldberg's interpretation isn't a plausible interpretation of his language. What did he get wrong in terms of what subsidy for early retirement means? Well, subsidy for early retirement means a subsidy that's dependent on early retirement. It doesn't say that. Does for mean dependent upon? For means because of. Exactly. Yes, and it's a subsidy because of not in the interminable sense of what is in the employer's mind in providing the subsidy,  and the requirements for a subsidy were that you meet employment, and in this case, you're assigned a laborer and there's a prominent job separation. Now, what case helps you? I know there's a case out of Dallas, the Crusoe's case, that your colleague relies on that seems consistent with what Judge Goldberg did here. But what case would you have that supports your position? Well, the Dallas case, I think, strongly supports the condition that the Dallas. Well, but Dallas was about specific technical terms defined under risk-accrued benefit. And it was a cutback, right? Yes. In Dallas, the question was whether a benefit subsidy was protected from cutback. But the court had a lot of analysis. In fact, in oral argument, I argued that case ten years ago in oral argument, the court focused very strongly on whether it was an accrued benefit or not. And the analysis is that it is an accrued benefit. It accrues, and there's a California case study in our reply brief that also helps us very strongly. There's the Laney case. Yes. The benefit accrues as you work because the amount of the benefit increases. Even though it's contingent, the contingency might never happen. The reason for the sort of strange language in the keynote arrow is that Congress was concerned that in letting the ex-boss take her share of the accrued benefit while her ex-boss is still working, they did not impose on plans something more than what the plan would have been willing to do. Can I just, just in terms of how much we're talking about, there are three letters that are in the record here, the March 26th letter of 2009, the May 26th letter, and the August 17th letter. One's at JA-33, JA-61, and the other one is JA-21. Lead me through this. How much do you think Ms. Hoover was supposed to get that she didn't get in terms of dollars and cents? Well, one, she should have gotten, and I think I read in a reply brief, that she should have gotten the difference between, I mean, it's something more than $500 a month additional. I calculated it as probably $20.06 or something like that. Right. That's not correct. What's interesting here is that the defendants reduced Ms. Hoover's ex-husband's subsidized pension by 53%, and they reduced the base pension, and they reduced the 80.7% subsidized pension that was just based on age and service, and they also reduced the separation pension. They reduced all of that by 53% to reflect Ms. Hoover's share. They paid 53% of the base pension to Ms. Hoover. They paid 53% of the 80.7% pension to Ms. Hoover. They didn't pay her 53% of the separation pension. They kept that for themselves. Now, the purpose of the human error... So they didn't give it to Mr. Woodworth? No, they didn't. They took it from him. It was reflected in footnote one of the party brief, which cites the court in the record. They indicated, quote, the enhancement of GP 401 was also actuarially reduced by 53%, and that's in footnote one on page two of my party brief. So they interpreted it one way when it comes to reducing Mr. Woodworth's pension, but they interpreted it another way when it comes to withholding that same amount of money. As they say in their brief, this is supposed to just be an allocation of the money otherwise payable to Mr. Hemingway's, and they shouldn't have a stake in it. But they inserted themselves in and they've taken out from the money that should be paid to one of the two, and a fair interpretation of the KBRO is that it was intended that whatever was going eventually to be due to Mr. Hemingway with 53% of it should go to his billboard. That was the parties agreement in the KBRO, and Congress has recognized that those agreements should be enforced.  Thank you. Thank you. Yeah. May it please the court. My name is Frederick Sandstrom, and I represent the PPL Corporation and related abilities in this matter. Could you take me through the three documents that I mentioned to your opposing counsel? Certainly. Let's start with JA43. That's the March 26th letter. Yes, sir. Ms. Leib, Romick, and bring your attention to the fifth paragraph. Yes, and that's the paragraph that I believe my colleague referred to. And so it's saying, the way I read it, it's saying to Mr. Lindenluth that under the GP401, that's the separation subsidy, the monthly straight life and living benefit is 44.8115. The order, that's the domestic relations order, provides that the alternate payee, that's Ms. Gruber's benefit, will include 53% of the value of any employer's subsidy for early retirement. Your enhancement of the GP401 is also reduced by 53%. Therefore, the terms of the order, the alternate payee receives an actuarially equivalent monthly benefit of 226108. That was before it gets reduced for the, under the QDRO. That's telling me that she gets 53%. And then I look at the August 17th letter, which is JA21. She gets a piece of the 401 money. She gets the benefit before the A. The final benefit she gets is 173012. So in other words, before the age adjustment, and that's a $520.96 difference. And so if she doesn't get it, it should go to Mr. Lindenluth. But apparently, she doesn't get it, and BBL is keeping it. Well, I believe, Your Honor, and as we explained in the district court briefing, that the March 26th letter, the one at JA33, that is actually a mistake in the letter, indicating the reduction of the GP401. It's a reduction of the supervisor. So if you've got an arguably ambiguous provision, and this is the way that it is interpreted by the woman in charge. She's the boss of this, and you're telling me that somehow we should just say that's a mistake. Well, I think the record is clear that it is a mistake because there's lots of other correspondence with Ms. Gruber, and this is a letter going to Mr. Lindenluth. There's other correspondence, but this was written to the husband. And the correspondence goes to the husband first, of course, because he's the participant. So if she doesn't get it, does he get it? Under the law, yes, he does get it. But he hasn't gotten it yet. I believe that he has gotten it, and this letter is simply misstating the reduction under the GP401 policy. So you're saying that he's getting the $520.96 additional equal actuarial? Yeah. So he doesn't get discounted. Well, he should not be discounted. I do not know, standing here today, the precise benefit he was receiving because that, frankly, was never itself a direct issue in this case. But isn't it your position he'd be entitled to it? That's absolutely right, Your Honor. And your colleague is saying that he's not getting it. Well, then something would be wrong if he were not getting it because under the law, the law without enquadros is clear. It's stated in the statute that it's a zero-sum game for the plan, and it's really just a question of location either. The participant gets X, and the alternate payment gets Y, or whatever, but the total liability to the plan on an actuarial basis is exactly the same. But if Lula Romick construed the plan as meaning that a portion of the GP401 would go to her, does that not render this at least somewhat ambiguous so that we should try to find out, you know, the intent of the parties? Well, I don't believe that Ms. Lula Romick ever interpreted with respect to the claim of Ms. Gruber for an actuarial purpose. But listen to this March 26th letter. It is dealing with Mr. Lula has submitted his pension application, which is a required process as part of his involuntary separation under the GP401 policy. That then generates a series of steps that are done, including the calculation of the benefit and the recalculation of Ms. Gruber's benefit. But what she's saying is that you ain't going to get 53% of the 401 subsidy because the QBRO requires that 53% of that actuarially reduced goes to Ms. Gruber. Well, I don't think she's going that far. She has the QBRO. Monthly benefit amount due under the QBRO went into the court. So she's certainly making it there. And to make it perfectly clear, under the terms of the order, the alternate pay Ms. Gruber receives an actuarially equivalent monthly benefit of $2261.08. I think that we are getting—the point is very well taken because clearly this was at least a mistake written by Ms. Lula Romick. But it is involving her correspondence and communication with Mr. Lindenberg. This is not a letter that was ever sent to Ms. Gruber. Why does that matter? Why does that matter? This is a statement. I've looked at the QBRO, looked at the plan. This is what's going to happen. Doesn't that reveal ambiguity? Well, I don't think it reveals ambiguity per se because when you're dealing with the claim by Ms. Gruber that she then submits for an increased benefit under the plan due to the GP401 policy and the forced involuntary separation of Mr. Lindenberg, Ms. Lula Romick is abundantly clear, and there's no ambiguity in her correspondence with Ms. Gruber directly, that Ms. Gruber is not entitled to receive anything under the QBRO. But the flip to that is that March 26th, Ms. Lula Romick is abundantly clear that she does. Well, but even to the extent that I didn't get to any ambiguity, one, the plan administrator's resolution in giving you the plan is, of course, subject to our deferential review. If you're doing a deferential review, I'm talking to the client. Let's assume that we're getting the plan and you were correct, although she says here's the QBRO. But let's just assume it's all of the plan. If you're keeping, you don't know if BPL is keeping the 520.96 per month that otherwise actually would have been reduced with Ms. Gruber, and they're not giving it to Mr. Lindenberg, that's a conflict of interest, so you don't get the benefit of deferential review. Well, I think the law is clear that you still get the benefit of deferential review in the event of a conflict of interest. It simply affects the amount of discretion given by the court. The Supreme Court made that clear a couple of years ago. You can never be taken out of the bucket of deferential review, but the conflict is considered as a conflict of interest. Why would Hallett apply? So we have De Novo standard. Sorry, Your Honor, I missed the first part of your question. Why would Hallett be Towers-Perrin-Foster case? Well, the Hallett case deals with the pure interpretation of Quadra. Isn't that what we're doing? Well, I'm... I mean, you're arguing the language. You know, I'm arguing that the language of the GP401 policy and the plan itself is abundantly clear that the benefit... I don't think there's any... So Judge Goldberg got it wrong? No, I think Judge Goldberg got it wrong with respect to the standard of review, but I also think the standard of review, with respect to one aspect of the standard of review, he's absolutely correct that the standard of review in the Quadra is De Novo. That's well established by Hallett and by much other case law. I don't think the standard of review is that important at the end of the day in this case because Judge Goldberg reviewed under De Novo standard and came to the same conclusion that he would advocate the court should come to either under De Novo or under a deferential standard, which is that the GP401 benefit, the benefit paid to the attorneys under that policy, is not a subsidy for early retirement. And I don't think... I mean, I've lived in a college... You can see the business up here, but there's any ambiguity in and of itself in the term subsidy for early retirement. That's a benefit paid on account of, because of, by reason of early retirement. And Mr. Wittenberg... But isn't it in part paid because they are retiring you early? They are kicking you out the door and they're paying you. Because you're not eligible for retirement yet. They're doing this to you. But it is because it's early, isn't it? Well, Mr. Lewis was eligible for retirement. He was eligible for retirement at this time with an 80.7% subsidy. And there's no question that Ms. Gruber gets her 53% share of that 80.7% subsidy as applied to December 20th, 2004. Let me ask you a question then. If he had not been forced out, and say he retired at age 63 and his benefit was only 90%, should he get 53% of the 90%? That is correct, because that's his voluntary decision to retire. And that's also the 90%, or whatever the actual subsidy is, calculated under the early retirement provisions of the pension plan. The GP 401 policy would not come into effect there, and there wouldn't be any issue with an involuntary separation. And I think that's the key. Is there anything in the record, I didn't see anything, but anything in the record where Mr. Levenworth objected to this letter of March 26, 2009, saying, hey, wait a second, she doesn't get 53% of that? There is nothing in the record. And I frankly believe there doesn't need to be any response from Mr. Levenworth on this letter. Now, my understanding is consistent with the party's understanding about the quadro event, that the quadro event that she would be getting 53% of whatever his pension is. We're going way outside of the record. My understanding is that Mr. Levenworth will not agree to give Ms. Gruber any portion of the benefit payable under the GP 401 policy. A quadro is a contract. It's a contract between two individuals. They are free to agree to a modification of the quadro at any time. And because PPL, like any plan sponsor, is obligated to follow the terms of the quadro, we would have to change the application if they got together. We suggested this to Mr. Levenworth. What I'm trying to ask this question is, you've had a divorce. Yes. And you're now left from the company. And the company is telling you that your 401 separation subsidy is going to be reduced by 53% because of the QPRO. And you would think, normally, that the husband would say, whoa, wait a minute, that's wrong. He didn't say that. And, Your Honor, I do not know why he did or did not say anything. I will concede there's nothing in the record. That said, I also, again, because the actual benefit being paid to Mr. Levenworth is not actually in the record, there is this letter, but this letter does not reflect any payment actually made, that it is quite possible that Mr. Levenworth actually is receiving the benefit enhanced by the GP 401. But that's not in the record either. At this point, at least up to a certain point, he didn't receive it. And you're thinking now, maybe he receives it, but you don't know. But I also think that, once again, Mr. Levenworth's views or supposed views, just like Ms. Gruber's supposed views, really don't have any bearing on the legal question of and the planned interpretation question of is this a subsidy. What I'm saying to you is that you've got a CUNY RO that has received an interpretation by the head of retirement in the company. And the husband, who otherwise has a clear dog in the fight, doesn't object to it. And he hasn't shown up in court? He has no obligation to be in court. But you don't have a real, other than the fact that you made the determination, you're not going to get money? No. We are not getting anything out of this case. Under the law, we cannot get anything out of the case. For PPL, this is a case about nothing, because we don't follow any court's order. And it's so generous because it's based on the quadro language. That's exactly right. It's not going to really have an impact. I think that the court earlier hit upon a very key point, which is that this was an involuntary separation. And that Mr. Rooney, when he was let go in 2009, didn't elect to take early retirement. He didn't say, you know what, I've worked a long time, I have the money saved up. The GP 401 is what comes into play when that happens. But when that happens And you may retire, clearly, against your will. Correct. And because of that, the purpose of the benefit being paid under the GP 401 is for severance. It's a separation payment that's over and above what you would get with a retirement plan. But I have to think that the calculation of it takes into account your years of service during which you were married. Correct? That's correct, Your Honor. But I think Kind of like your pension and the percentage, because it was accrued during your marriage. But that also elaborates form over substance. The benefit is I don't think that's more substantial than It's a cash amount that is going to Mr. Lindemann. PBL could have formulated this benefit in any way. I mean, it's just an actuarial number. We could have had a team of actuaries come in and say, well, we'll give you a lump sum cash equivalent of what this increased subsidy is. In that case, we wouldn't need to be here because there wouldn't be enough money in, because I think it's a dispute that a lump sum payment to someone in retirement is not subject to this water. It would be clearer if the GP 401 were entirely because we feel guilty we're kicking you out as compared to having some actual actuarial significance in that it is essentially early. That is absolutely correct, Your Honor. It's what covers the delta between your retirement early and if you had stayed or being forced to retire early. And if you stay to 65, it's a full subsidy. Time is out, but a very key point in response to that. You mentioned, Your Honor, the delta between staying to 65. If Mr. Lindemann has stayed until age 65, the great irony here is that Ms. Gruber would not get any additional benefit because if he works until age 65, there is no more early retirement subsidy to be paid. So the notion that Ms. Gruber has some expectation, but she also doesn't get the GP 401 separation subsidy, but he would get the same benefit that is paid under the GP 401, because the GP 401 is giving him a 100% benefit, which is the benefit he would get at age 65. Thank you, Your Honor. Thank you. Mr. Rhodes? Your Honor, I'd like to direct the Court's attention to page 46A of the appendix, because on that, that's the post-retirement in-adoption election form provided to Ben Lindemann, and it also reflects a reduction of $2,220.07 for the QDRO. As far as I can tell, that's the only document in the record 46A. Did you argue estoppel to us? I don't believe that, Your Honor. We have to do something about it. I'm just going to argue that. So, in any event, it appears, you know, we said in our reply brief that they were keeping the money. They're saying now they don't think they're allowed to keep the money. We agree they're not allowed to keep the money, but we think they are, and the record indicates that they are, including the election form given to Mr. Lindemann, because he is being paid on the basis of a 53% reduction in this very benefit. But, Your Honor, what evidence do you have that they now have that money and they haven't paid it to him? That's a pretty serious statement. Well, I'm sorry, the only evidence I have is what's in the record. I came into this case on a bill, and I have the record before me. Okay. You made a statement in footnote to your reply brief. What's the basis for the statement? The basis is page 46, which gave him the election and told him how much he was going to get. But we don't know what happened after that. We don't know whether there was something changed, but I would submit that it would have been a change. If this one, the final election form, and there was another one that reflected a change in the plaintiff's interpretation of this KDRO, that should have been put in the record by then. But this one's not signed. This is probably the only statement of record that was submitted to the court. Okay. Excuse me, you were talking about 41-42. It's also on 41, yes. I'm sorry. That would be signed. There's the thing that replicated. But it's the same document, and it provides the reduction. A quote from Judge Van Aske that the KDRO meant that she would be getting 53% of whatever pension he gets. That, in a nutshell, is the plaintiff's position, in this case, the appellant's position. The parties intended that whatever pension Mr. Lee ended up getting, 53% of that would go to Ms. Gruber. And they agreed that she could get the part that they could ascertain up front, she could get as soon as he reached age 55. And if he got more, because you can't tell, as long as he's still working for her, whether he'll get additional pension benefits, if he got more, she would be getting the other 53%. Did Mr. Gruber ever enter any type of appearance to counsel in this case? No. And do you have any indication as to whether he has ever objected to the 53% of the GP 401 separation subsidy going to his former wife? As far as I know, Your Honor, it's not. But I think I'm constrained to rely on the record, and it just simply isn't reflected in the record, Your Honor. I see that my time is up. If there are any further questions, I'll be happy to answer. Thank you very much.